Richard Chambliss, Appellant, Trend Gaming Richard Chambliss, Appellant, Trend Gaming Richard Chambliss, Appellant, Trend Gaming Richard Chambliss, Appellant, Trend Gaming Richard Chambliss, Appellant, Trend Gaming Would GameTek express surprise or dismay if Trend had gone to bingo parlors in Richmond or to Roanoke or to Abington? No, I think that during the course of the four years that the agreement was in place, GameTek was in fact encouraging Trend to expand its business throughout the territory of Virginia. That, of course, would have worked to Trend's benefit because they would have had a larger client base, they would have had greater compensation, and during any phase-down, they would have had a lot higher phase-down payout. The bigger the base as of the charities in place at date of termination, then the larger the commission or compensation payable to Trend. Why should we be surprised then that, and why would it be illegal to have a non-compete clause that would be co-extensive with the territory over which they were granted the privilege of representing GameTek? The entire southeast, it wasn't any neighboring states. I think, if I understand your question, Your Honor, I think your question goes to the territory issue of the non-compete, Virginia as opposed to the Tidewater Basin area. If you were operating a Dairy Queen in Norfolk, and then we had a non-compete clause that covered the state of Virginia, I'd say, well, that's absurd that I can't run a Dairy Queen in Winchester just because I used to operate a Dairy Queen in Norfolk, because those are hundreds of miles apart. They're completely different marketing. But your client had the right to develop a client base throughout the entire state. But why would it be unusual, why is it illegal, then, that they should have a non-compete clause for the same territory over which they had control? The non-compete should be looked at, at least by Arizona law, in at least three different categories. One is the territorial restriction of the non-compete. What is the geographic area in which this non-compete is placed? Are these both national firms? No, Your Honor. Trend was a Kentucky limited liability company with its headquarters in Austin, Texas. Its only business was the business of distributing bingo in Virginia after the Kentucky territory was severed from it. Game Tech is a- I don't think you understood what I was trying to find out. I'm not asking about state of incorporation or where the activity covered by the contract took place. Yes. I'm asking whether both Game Tech and Trend Gaming both do business in one way or another with one company or another nationwide and not just in Virginia. The answer to that question, I believe, is no as to Trend. Trend's only business was distributing electronic bingo in Virginia after Kentucky was severed some relatively short period into the four-year period of distribution agreement. Game Tech's a publicly traded company that I think has bingo distribution in 38 states, if I'm remembering the number correctly. So Trend's the small guy. Game Tech's the big guy. To get back to the question that was asked regarding the- Now, let me ask you- The territorial. Okay. Many of the restrictive covenant cases in the books have a pretty clear public interest component. For example, when a medical group brings a doctor to a small town, they'll often have a restrictive covenant so that they don't set him up in practice and then have him leave and take his patients with him and leave the medical group set up on his own. Strong public interest if what they're doing is running the one neurologist in town out of the state or out of the town or if they're running the one ophthalmologist out. Here, it doesn't look as though there's any public interest except in providing perhaps the most competitive environment for bingo distributors. I think it could be categorized in three different ways, Your Honor. On one end of the spectrum or the continuum is the non-competes that are ancillary to the sale of a business. In the middle of this continuum and maybe a little bit closer to the right, as my continuum is based, are the non-competes that go to traditional employees such as insurance salesmen or other folks that have territories. And at the far end of that continuum is the doctor case that you're talking about where there's really a very compelling interest to make sure that the citizens receive medical care. And Arizona has a case on that. As an insurance salesman, you worry about making a man unable to earn a living, and that's something that the courts have considered in many of the restrictive covenant cases. Yes. Here, you're dealing with corporations, not individuals. So it's hard to see how that would apply. You're dealing with, on one hand, a publicly traded corporation. On the other hand, a limited liability company that consisted of a couple of members. A limited liability company is a corporation. As opposed to sole proprietorship or an individual. But I think your question goes to, where's the public policy here? And you addressed it in part by, is this just an anti-competition, non-competition public policy? And that would be my response to you. The far end of that continuum, this is not an oncologist. Now, the reason that these things are tolerated in contracts is that people can't really safely use salesmen at all. They can't really use agents at all if the agents can easily and freely twist the business away, twist their customers away. And that seems to be what this case is about. But the cases say that the employer has a legitimate business interest in protecting its customer base. And, therefore, if it has a narrowly drawn restrictive covenant, it will be enforced because it has a ---- The three years strikes me as totally unproblematic for the reason that Judge Bybee raised in his question. Basically, they get paid for not working for three years. Yes, Your Honor. And I'm not ---- The scope of the activity, basically calling on customers or divulging their names, it's hard to see where there's anything unreasonable about that. Scope is the only thing that strikes me as even arguable, and I'm not sure I see the problem. The issue that I'm arguing ---- Territorial scope, I mean. Well, the territorial scope is, by definition, on the non-compete. The territory is the state of Virginia. Because that's where they were free to sell before. That's where they were free to sell before. But by practice and by the four years of their efforts, they were servicing, forgive me if I get the number wrong, 14 charities, I believe, that were located in the Tidewater Basin, which is all within a 20-mile area of Virginia, and additionally the Fort Lee charity, which was a military ---- Under the non-competition agreement, if somebody was never a customer before, could ---- but they're in Virginia, wouldn't TRND be free to call upon them, solicit them, and not be in violation of the non-competition agreement? TRND says no. Game Tech says yes. Give me the words that you rely on for the no answer. The no answer was the testimony by Stephen Hieronymus that he understood that non-compete to be throughout the territory of Virginia, since it said territory of Virginia, and that he ---- Well, it says within the territory, but then it goes on to prohibit activities. And it says within the territory, let's say that's all of Virginia. For the term of the phase-out payments, let's say that's three years. Now, what is it that they can't do in the Commonwealth of Virginia for three years? They can't call upon, divert, influence, solicit, or attempt to call upon, influence, or solicit any customers of Game Tech or assist anyone else in any way in doing the same. For any reason ---- Call upon customers of Game Tech. For any reason whatsoever. Yes. Whether it's related to ---- No application of the covenant, because even though the activity is within the territory, it's not a prohibited activity. Am I wrong on that? Am I missing some words here? No. You're asking me what's the no part, and I'm answering, I'm responding to you with the no part. I mean, suppose I'm a Holmesian bad man here, and I'm in Trent's position, and I read this to see what I can get away with. Well, I can solicit Game Tech customers outside of Virginia. I can try to twist Game Tech customers in Vermont or anywhere else I want to go, Maryland. I can solicit Game Tech customers out once the three years is over. During the three years within Virginia, even though I'm bound by the covenant within Virginia, the only activity that I'm not allowed to do is try to twist Game Tech customers. I'm allowed to influence call upon anyone else, so I can still earn my living distributing bingo equipment. Am I misreading some words in the covenant? No. You are reading those correctly, and I would submit, because I'm certain opposing counsel will point out, the trial court in post-verdict proceedings issued an order in which he said that the jury found the term, quote, customer of Game Tech, end quote, to mean the charities that were in place as of September 28th of 2002, those charities that were being serviced the last day of the term of the distribution agreement, and Judge Holland also then said in that order, and I so find the same. My argument is not concerning. I think I'm stuck with the factual finding that customers of Game Tech, pursuant to that non-compete, are the 12 charities in place as of September 28th of 2002 that were using Game Tech equipment that Trend then put onto the patina manufacturer. My argument concerns the language above customers of Game Tech when it says for any reason whatsoever. What's the problem? The problem with for any reason whatsoever is it says you can't literally and clearly contact a customer of Game Tech to sell paper bingo products. You can't contact a customer of Game Tech to sell. Why is that unreasonable? I mean, once you're no longer an agent for Game Tech or a distributor for Game Tech, what is the unreasonableness in Game Tech saying, see if we're not working, but stay away from our customers? Why does Game Tech have a legitimate business interest in prohibiting Trend from contacting a customer of Game Tech for the purposes of doing some sort of business that Game Tech doesn't do? Game Tech's sole business was electronic bingo products, period. Game Tech had no legitimate interest in protecting its customers from somebody soliciting them for Girl Scout cookies or for the sale of Cokes or cigarettes or for the sale of paper bingo products or other things of that nature. Does one conclude that if Trend develops or tries to develop an ancillary business relationship, that that leads to erosion of the relationship and that they can gently move another supplier into supplying the things that Game Tech had? No, because if they are contacting for purposes of paper bingo products, which should be permissible because Game Tech has no legitimate business interest in precluding that activity, as long as Trend doesn't then cross the line and get into electronic bingo products, it should be fair game. Why? I mean, if I'm selling electronic bingo products, I have a very strong legitimate business interest in my ex-salesman not going to my customer and saying, buy the paper bingo products for me. It will be cheaper. The customers will have more fun. It will remind them of when they were kids playing bingo. For the four years that Trend was supplying electronic bingo products, there are other suppliers of paper bingo products. Each bingo game that takes place with 30 or 50 or 60 people in there has the electronic component that some players use and has the paper products that other players use. It has the gifts and novelties that you win when you get the bingo diagonal. All of those were sales activities that had nothing to do with Game Tech throughout the four years that Trend was the distributor. There were other folks selling them those products. Game Tech has no interest in protecting its non-electronic bingo products, but the non-compete is broad enough to prohibit that. It's not narrowly drawn. Your argument would be far more powerful. If what Game Tech was trying to do was it had either refused to make the post-termination payments to you or was bringing some other kind of tort suit against Trend to prevent them from going, let's say, into Richmond and trying to sell products of whatever nature related to bingo, whether they were electronic or paper, in a completely different market. But that was not what your client was doing. Your client went right back to precisely the same customers to sell them precisely electronic equipment. Your client wasn't trying to sell them Coke machines. He was trying to sell them Bettina's line of equipment. I mean, your client here, unless I've missed something, is in absolute flagrant violation of this agreement. And the only way that you can win is to get the whole agreement tossed out. Am I right? You've got a tough position, counsel. I'm sympathetic to you. Yes, you are right in that characterization, particularly after we've had a jury verdict and a jury determination. There were many issues in the years that led up to the litigation about why Trend did what Trend did. But sitting here today, I can't argue that a jury ‑‑ there's been a jury finding that my client breached the contract and interfered with contractual relations. You're telling us as a matter of law we have to conclude that the agreement should be totally thrown out because of that phrase of prohibited competition in other products. I'm telling you, yes, I'm telling you that as a matter of law, that the law should be enforced impartially as opposed to sympathetically and that the policy there is if an employer overwrites a broad noncompete, they're stuck with that language. If they wanted to bargain for and get the broadest protection possible in their noncompete, they're going to fall or live by that language. And the argument here is while my client is unsympathetic, the language for any reason whatsoever encompasses a whole lot more than electronic bingo. And if you look to Article 3.3 of the agreement, you can see that if Game Tech wanted to write a provision that was limited to electronic bingo, they could do it because the last sentence of Article 3.3 defines what competition is and it's doing anything having to do with electronic bingo products. That's not the language that's in Exhibit C. I have 30 seconds if I could hold those for some rebuttal. Good afternoon, Your Honors. Jeffrey Walsh, pleased to appear for Game Tech International. The Court has already identified the opening argument that I was going to make, and that is that there was an elephant in the room with this restrictive covenant, and that's that it was highly compensated for. Not only was it highly compensated for, but it was negotiated in that way by very experienced business people. And in addition to there being an elephant in the room, if I can really butcher a metaphor, there was also a rhino in the room in the sense that it didn't leave a lot of room left for the covenant, and that's that this was not a covenant not to compete, but an anti-piracy provision, as the Court has recognized and that I want to make clearer when I talk about the geographic scope here in a minute. The only thing the trend was prohibited from doing was soliciting the customers of Game Tech as they existed. As of the date, this contract expired. Fifteen customers, 14 in Tidewater, and one 75 miles away at Fort Lee. The contract was written with the word territory there for two reasons. Originally, the territory was defined more broadly. As Judge Bybee mentioned, you know, it was Kentucky and Virginia, and Trend Gaming had the opportunity to expand across the state. One of the reasons that they didn't is the reason that we allowed the contract to expire. They really weren't accomplishing what we wanted. But the other reason that the territory was put in there was to distinguish it from the other 49 states where Trend Gaming could still do business. As you know from our papers, and Mr. Chambliss mentioned, we're in 38 states. We do business with this trend or did business with this trend in Virginia. We did business with its parent company in Texas, where it was our largest distributor. And the other states were wide open. There were discussions. The trial record is full of testimony about there were discussions about the parties doing business in other places. When they put this particular restrictive covenant together, the intention was to define the customers within a defined territory. Am I right in thinking that under this deal, Trend Gaming could have gone over to the Maryland side of the border between Virginia and Maryland and gone ahead and solicited GameTex customers there? Exactly right, Your Honor. And, in fact, the testimony on both sides of this issue at trial by Mr. Hieronymus, who negotiated it, and Mr. Myrie, who negotiated it for my client, was that it was meant to deal with Virginia only. The only issue of dispute was Mr. Myrie said, look, I was talking about customers, our existing customers in Virginia. He said, I wanted it to be that you would stay out of Virginia altogether. Hieronymus wouldn't go for it. And what we settled on was a non-solicitation provision involving the customers in Virginia. So there was no testimony, Your Honor, to answer your question that they couldn't go over the border to North Carolina, Maryland, or anyone else or back to Kentucky and start business there. And your contention is that Trend also could have gone back into even the Tidewater area, as long as they didn't go to GameTex customers. Exactly correct, Your Honor. The geographic, and that's the point that I wanted to get to next, the geographic scope of this was the four walls of every bingo hall where we had customers. In Virginia? In Tidewater, Virginia, exactly. It was a very small geographic area. What about the for any reason whatsoever language? Did that include non-GameTex products as well? There was a dispute between the parties, but let me start out by saying, Your Honor, that neither one of these parties has ever done business other than in electronic bingo. Neither one of them did any business in paper bingo, soda pop, or anything else that Mike wanted in a bingo hall. So the context of this entire discussion in Exhibit C was the products. The reason it doesn't say electronic bingo products there is that if you look in Section 1.1 of the distribution agreement that this restrictive covenant is attached to as Exhibit C, it says that Trend Gaming is getting an exclusive distributorship of all of our electronic video bingo and similar products, but they're also getting a first right to negotiate for any other products that GameTex develops later. So if we had developed pull tabs or whatever other gaming product might be available in Virginia and legal in Virginia for charitable purposes, Trend had a right, a first right to negotiate for them. So you don't want to define it so narrowly, but the testimony by Mr. Myrie was if he wanted to go in and sell soda pop, paper products, or whatever, so be it. But I agree with Your Honor's argument that we could lawfully have precluded Trend Gaming from going into those halls at all for any business purpose while we were paying them this rich compensation for three years because somebody who gets a toe in the door selling paper products or something else has every opportunity to say, you know, if I cut my paper products so that they're 10% of the cost of the electronic bingo products, maybe I can switch a number of people away from electronic to paper products. In other words, you don't want your competitor who knows these customers this well to get in the door for any reason whatsoever. And because this is a non-solicitation provision, which under Arizona law is viewed much more leniently and is considered much less restrictive than a covenant not to compete, whether we read that broadly or narrowly, it's our position that that was entirely lawful under the circumstances. Help me on something really elementary here. My only experience with bingos as a little kid, and I think what we had was we had boards and we'd put wooden chips with letters on them. Somebody would draw a letter from other wooden chips. Yes. Is that called paper products type bingo? That's a paper product. They use a dauber now, an ink marker rather than a chip, so that you make a permanent mark on that piece of paper. And the difference is that my client's product is a computer that will allow you to play arguably up to a million screens at a time, although the state's regulated to like 30 or 60. You can play a number of different bingo cards all at the same time, and the computer will track them for you. So what do I have in front of me? You have something that looks bigger than my BlackBerry, and it's a handheld unit like an old Texas Instruments adding machine type of thing or something. And on it is an electronic computer screen that automatically shows you the card that is closest to you winning, if you've bought, say, 10 cards. And it's automatically tracking where you are as the reader up front says, that ball is B16. It sounds way more expensive than little kids bingo, but I guess if somebody can play 30 or 50 cards or whatever at 25 cents a card, it starts getting to be real money. That's right. It's purely a question of how much you want to spend, but it's also regulated by the states because it is for charitable purposes, so people aren't going out and spending thousands of dollars a night. They're spending smaller amounts of money. So I've talked about the elephant in the room. I wanted to say one other thing, and we mentioned this, and I think it was in a footnote. And I think that this is a very important point because Mr. Chambliss' argument in his papers that he didn't really have time to get to was that the jury should not have been given the question of the reasonableness of the scope. Now, we've been talking back and forth about isn't this reasonable under the circumstances because it's compensated for and the geographic area is each individual bingo hall and only those that Trent's getting paid to leave alone. But if we take a look at Restatement Contracts, Section 188, Comment B, which we cited in an extensive footnote in our papers, it says, in some instances, however, a promise to refrain from competition is a natural and reasonable means of protecting a legitimate interest of the promise arising out of the transaction to which the restraint is ancillary. In those instances, the same reasons argue for its enforceability as in the case of any other promise. What we have here for is a compensated, a separately compensated for promise. It happens to be a measure of a restraint of trade because it prevents Trent from walking into 15 halls, but that's no different than any other contract that obligates a party to do something or restrains a party from doing something. This particular clause, because of the way it was drafted as a non-solicitation agreement and because it was compensated for, I suggest, should never have been submitted to the jury on a restraint of trade jury instruction. In other words, jury instruction 32 was irrelevant. We believe that the jury should simply have been asked to decide what does the covenant mean and has it been breached. And the only issue that we think the jury needed to decide was, was this an option or not. And the jury did decide that question. You're asking for a new trial. I'm not, Your Honor, because I won. I won or I beat the shoe might be on the other foot otherwise. I mean, we did argue, you know, this is a non-solicitation provision. This should be treated differently. And when you read the cases, the Gann case and the Hillborough case that we've cited in our papers, they don't really get to that issue. They do say something that's compensated for is treated much more leniently. They do say a non-solicitation provision does not contain the same types of problems that we see otherwise and is not judged as necessarily unreasonable. The standard gets very relaxed. Then when you look at the restatement of contract section that I mentioned to you, this comment, our view was this is just a separate promise that's compensated for. This should be treated simply as a breach of contract. And, in fact, this jury did decide this was not an option. Therefore, you had to adhere to it, Mr. Hieronymus and your company. And, two, you breached it. Three, here are the damages. There's nothing here to set aside or send back to the jury at all. But if the Court disagrees with me on that, we don't believe that it would need to go back for a jury trial at all. The first question it would have to go back for is on the judge to consider what I raised in my Rule 50 motion before we put it to the jury, which is, isn't this covenant on the face of it enforceable? Could a reasonable jury have ever determined that this was an unreasonable, unenforceable covenant? And because I raised that on Rule 50, and, of course, the judge didn't need to consider it because the jury went my way, I think if this is going to go back, it doesn't go back for a new jury trial. It goes back for further findings and consideration by the judge because the judge sat there and heard all the evidence. And not only do I think he could rule, I believe he would rule in that regard. And the reason that I believe that is because he ruled on our permanent injunction motion, and he found separately on that motion that this was a reasonable, enforceable covenant. He cited both the jury's findings and his own findings in that regard. It seems like he did it in detail. He went through everything about it. He did all but rule in my favor on a Rule 50 motion, and that's just because he didn't have to, because the jury went my way. So I think that, you know, we're going through almost a pointless exercise in sending this back to Judge Holland. I think this Court obviously can sit as a matter of law, interpret a contract as any other contract, and say this is enforceable as a matter of law, even if you believe that the words, for any reason whatsoever, should be raised. Scalia. Tell me, do you think the trial judge made an error in doing it the way he did, and you just want us to ignore it? Or … Dreeben. I'm saying that it's an error that doesn't make any difference at all. Scalia. Do you think it was error to send that to the jury? Dreeben. Yes. I don't think it was error to send the case to the jury on the question of was this an option or not. You're saying you should have had a direct verdict. Was there a breach or not? You should have had a direct verdict on that. I think I should have. Had you done it, didn't the jury come back and do exactly what the judge did, would have done had he done what you wanted him to do? Exactly. And then he affirmed all that in his subsequent findings? Exactly. Exactly. So why are we sending it back? Well, that's why I'm asking you. No, I don't think it does get sent back. I don't think it gets sent back at all. You're not arguing that we should vacate and remand. You want to affirm, right? Exactly. I do. I keep getting confused by your argument. No, no. I'm sorry. I thought I prefaced this by saying you were saying the judge made a mistake against us, but we won anyway, so it doesn't matter. Exactly. My point was simply, and I didn't preface this clearly enough, what I said was if the court disagrees with me that this doesn't need to be sent back, then it wouldn't be sent back for a new jury trial. That would be a tremendous waste of court resources and money. It would go back for the judge to make the findings necessary. But I don't think it needs to go there. I think it stops right here. I just don't presume to tell your honors that, you know, you must go my way. And I'm saying if you're thinking something different, I do not agree with Mr. Chambliss at all that this means a new jury trial. It means the judge who's made all these findings already simply needs to reaffirm them and say, look, there's no credible evidence to send this to the jury, that no one has seen this on these facts. I think you would say you would have been entitled to summary judgment had you moved for one, and you're certainly entitled to judgment as a matter of law after all the evidence. Exactly. I think the only triable issue of fact was that option question. And the judge found that as one of the reasons why he didn't grant summary judgment was Mr. Ronimus is saying it's an option. He can either take the compensation or he can take the customers. The jury decided on that. I don't know how I could have gotten summary judgment on that. That was kind of a back and forth thing. The jury went my way. I think the rest of it, there's really nothing to litigate at all. There are a couple of other issues in the case. I see I've got about four and a half minutes here that I would like to mention just briefly. One is the attrition rate issue. This is the damages should have been reduced by a third because charities come and go. And, you know, the trial court, I thought, made very good findings on that, on the post-trial motion. He said, first of all, the jury was free to reject the testimony of Stephen Ronimus about customer attrition. There was absolutely no evidence there that these 12 or 15 customers were likely to leave in the interim, in the three-year period. They could have been there for years. They might be there for years afterwards. Furthermore, our expert, Stephen Clark, said, I'm not basing the damages simply on these 12 customers that Trend Gaming stole from us. Those 12 customers represent slots in bingo halls. The St. Mary's Food Bank has Tuesday night every week. A certain crowd comes on Tuesday nights because that's their social night for bingo. If St. Mary's Hall decides at some point they're not making money on bingo or they want to do something else to raise money, another charity comes in. Maybe it's the local high school band on that Tuesday night. But we have that spot at that bingo hall. Our equipment goes into that hall on a rotating basis. That slot guarantees us to a reasonable degree of certainty that we're going to continue to get that revenue even if that particular charity leaves. So that's a tremendous advantage to us. I can never say it's a guarantee of an income stream, but it's the closest thing to a guarantee of an income stream because the bingo hall owner is making sure he's got that hall filled with some charity every single night and we're the supplier of the products to them. That's what was so valuable, and that's what Mr. Clark was basing his damage claim on. Finally, on the issue of the punitive damages, there was ‑‑ I thought that the trial judge, Judge Holland, did a tremendous job of summarizing the evidence that the jury found of actual malice. And as I understand Mr. Chambliss's argument, it's that, well, the mere fact that there's an intentional tort doesn't mean that there's also malice. I agree with him. But what we had here was secretive conduct that was not disclosed to us. They accumulated your competitors' machines in somebody's basement? Exactly. Of the distributor? Of the distributor that we were paying 85% of his salary for, Mr. Delaney. They moved the stuff in there. They had Mr. Delaney go out and sign all the customers to new two‑year generic contracts that would allow them to bring others in. Is that what the punitives was about? Hiding all the stuff in Delaney's basement? Exactly. When he got enjoined using his wife? And in addition, in addition, Mr. Delaney negotiated something in his contract, as did Bettina, our competitor, that said essentially we need a breakup fee because, Trend, it's uncertain whether you're going to be able to survive GameCheck's lawsuit when it comes. There already was a pending lawsuit between the two of us over this Virginia relationship. So we want a breakup fee in case you are kicked out of there. And Trend gave it to them. There's the guilty conscience right there. And as Judge Holland said, no honest explanation for what they did or why they did it was ever offered in this courtroom. I find evidence of malice, as did the jury. That's a credibility determination. That's a weighing of the facts determination. There's certainly enough evidence there, and we suggest that that shouldn't be disturbed either. Can I answer any other questions for the court? Thank you, counsel. Thank you. Take one minute. Three very quick items. This was not a sale of a business. The charity contracts that Trend had were assignable. The distribution agreement did not require the assignment of those contracts. There was no sale of business. Therefore, the cases that talk about noncompetitions ancillary to a sale of business are not applicable. The law in Arizona seems to be very clear on this, and that is reasonableness of a noncompete is a matter of law for the court to decide. The Rent-A-Center case. Let's say the judge erred in submitting it to a jury. Yes. What does it matter? It matters because we don't know what for any reason whatsoever means sitting here today. We don't know because the jury certainly doesn't tell us. We tried to have jury instructions that would be submitted for the jury to answer that question. Once the judge said, I'm giving this to the jury. If it's a matter of law, then it shouldn't have gone to the jury. We should have just figured out what it means for ourselves, or else we have to send it back to Judge Holland to have him decide what it means, right? Yes. That's my point. We don't know what the, as a matter, we don't know for any reason whatsoever what it means. What's the outside reach of that phrase, for any reason whatsoever? The outside reach of that phrase is exactly what the plain meaning and language is. Candy bars, Coke machines. Cigarettes, novelty items. Couldn't any interpretation conceivable prohibit you from selling GameTex competitors electronic bingo machines to GameTex customers in Virginia? Well, you look to that. What your client was doing. You look to that language. Does for any reason whatsoever mean, parenthetically, limit to electronic bingo equipment? When in Article 3.3, if they wanted to say limited to electronic bingo equipment, they could have? What does a potential ambiguity around the edges matter when GameTex was doing what, under any interpretation, would be prohibited by its own agreement? I think, Your Honor, you said GameTex was doing. I meant trend. GameTrend was doing. GameTech is stuck with the distribution agreement and the Exhibit C that it bargained for and signed four years earlier. And they bargained for and agreed to an overbroad provision. And as a matter of public policy, that overbroad provision should not be enforced. Why should it? My client is, I admit, under these facts, not sympathetic. But this Court shouldn't make a decision about the overbreadth of the language on the basis of whether my client is sympathetic or not. The Court should look at the language for any reason whatsoever and give it its true meaning. I have nothing further. Any questions? Thank you, Counsel. GameTex v. Trend is submitted.
judges: Kleinfeld, Bybee, Whaley